UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

PORTLAND DIVISION

**UNITED STATES OF AMERICA**,          Criminal Case No. 3:09-CR-00273-KI

       Plaintiff,

                                       OPINION AND ORDER

              v.

**VERNON L. WOODALL,**

       Defendant.

      S. Amanda Marshall
      United States Attorney
      District of Oregon
      Jane H. Shoemaker
      United States Attorney's Office
      1000 S.W. Third Avenue, Suite 600
      Portland, OR 97204

         Attorneys for Plaintiff

Charles J. Wiseman
Wiseman & Associates
3760 NE Jackson School Rd.
Hillsboro, OR 97124

Mark Austin Cross
Attorney at Law
294 Warner Milne Road
Oregon City, OR 97405-4044

    Attorneys for Defendant

KING, Judge:

Defendant Vernon L. Woodall is federally charged with Travel with the Intent to Engage in Sexual Conduct with a Minor, in violation of 18 U.S.C. § 2423(b). After Woodall's competency to stand trial became an issue, the court committed Woodall pursuant to 18 U.S.C. § 4241(b) to a federal medical facility for a psychiatric and psychological examination to assess his present competency to stand trial. The clinical staff concluded that Woodall suffered from a mental disease that substantially impaired his ability to properly assist counsel in his defense. The court then committed Woodall pursuant to 18 U.S.C. § 4241(d) for treatment to restore competency.

Woodall refused to take the prescribed antipsychotic medication voluntarily. The warden at the federal medical center asked the court to conduct a hearing to determine if Woodall meets the criteria to be forcibly medicated to restore him to competency, as explained in <u>Sell v. United States</u>, 539 U.S. 166, 180-81, 123 S. Ct. 2174, 156 L. Ed. 2d 197 (2003). For the reasons explained below, I conclude that Woodall does not meet the <u>Sell</u> criteria, and I do not order him to be forcibly medicated.

**LEGAL STANDARDS**

In United States v. Ruiz-Gaxiola, 623 F.3d 684 (9th Cir. 2010), the court explained the factors for a court to consider before ordering a defendant to be forcibly medicated to restore competency to stand trial. The court vacated the trial court's order to forcibly medicate the defendant, a man suffering from a delusional disorder who was not a danger to himself or others within the prison system and did not think he was mentally ill. The defendant was charged with illegal reentry.

> A court may not grant such a request unless the government shows (1) "that important governmental interests are at stake" in prosecuting the defendant for the charged offense; (2) "that involuntary medication will significantly further those concomitant state interests," i.e., it is substantially likely to restore the defendant to competency and substantially unlikely to cause side effects that would impair significantly his ability to assist in his defense at trial; (3) "that involuntary medication is necessary to further those interests," i.e., there are no less intrusive treatments that are likely to achieve substantially the same results; and (4) "that administration of the drugs is medically appropriate, i.e., in the patient's best medical interest in light of his medical condition." Sell v. United States, 539 U.S. 166, 180-81, 123 S. Ct. 2174, 156 L. Ed. 2d 197 (2003). Orders authorizing involuntary medication pursuant to this standard are "disfavored." United States v. Rivera-Guerrero, 426 F.3d 1130, 1137 (9th Cir. 2005).

Id. at 687-88.

The significant liberty interests involved "call for equally significant procedural safeguards. Because 'an order compelling a person to take antipsychotic medication is an especially grave infringement of liberty,' it requires 'thorough consideration and justification' and 'especially careful scrutiny,' and must be based on 'a medically-informed record.'" Id. at 692 (quoting United States v. Williams, 356 F.3d 1045, 1055-56 (9th Cir. 2004)).

The Sell factors are not a balancing test. The government must prove the facts "necessary to allow it to prevail as to each Sell factor by clear and convincing evidence." Id. at 691.

**DISCUSSION**

I do not take this question lightly and will scrutinize the four factors in turn.

Dr. Robert Sarrazin, Chief of Psychiatry at the United States Medical Center for Federal Prisoners in Springfield, Missouri ("FMC Springfield"), testified for the government. Dr. Sarrazin is certified by the American Board of Psychiatry and Neurology with subspecialty certifications in forensic psychiatry and psychosomatic medicine. Also in evidence are three written reports from the federal clinical staffs at FMC Springfield and FDC SeaTac concerning Woodall and a July 10, 2011 psychological evaluation by Dr. Donald True, a psychologist retained by the defense.

When Woodall arrived at FMC Springfield, he was assigned to Dr. Christina Pietz, a forensic psychologist. Dr. Sarrazin interviewed Woodall numerous times and consulted on medications. Because Woodall has some physical illnesses, notably, multiple sclerosis ("MS"), he also was examined and treated by other physicians at the facility. A neurologist treated the MS and consulted with Dr. Sarrazin about possible interactions between MS and antipsychotic medications. Dr. Sarrazin also consulted with a pharmacist.

Dr. Sarrazin explained that the staff at FMC Springfield held a Harper hearing, as outlined in Washington v. Harper, 494 U.S. 210, 110 S. Ct. 1028 (1990), and found that Woodall was not a danger to himself or others and did not require emergency administration of involuntary medication.

The Sell hearing took about two hours. Woodall was brought to the hearing in a wheelchair. He paid close attention and, for the most part, remained quiet. Several times during the hearing, however, Woodall disagreed with the testimony to the point that he was compelled

to explain something to his attorney. During these discussions, Woodall appeared agitated and spoke in a whisper loud enough for his words to be understood 25 feet away. I stopped Dr. Sarrazin's testimony during one outburst to allow defense counsel to give his full attention to Woodall for a few minutes in an attempt to calm him down. Woodall repeatedly brought up two points during the outbursts. First, that he was not bipolar. Second, that the MS treatment given to him was different than what he agreed to comply with and was never the treatment with steroid drugs that he needed.

I.   Governmental Interests

The government must show that important governmental interests are at stake in prosecuting Woodall. Ruiz-Gaxiola, 623 F.3d at 693. Special circumstances can lessen that interest, such as a defendant being subject to a lengthy period of civil commitment or a defendant who has already been confined for a significant amount of time for which he would receive credit toward a sentence later imposed. The appropriate starting point is the expected guideline range. Id.

In Ruiz-Gaxiola, the court found that a likely sentencing range of 53 to 78 months, after adjustment for time served pretrial, was a substantial period of confinement that, with only a slim possibility of civil commitment, was sufficient to satisfy the first Sell factor by clear and convincing evidence. Id. at 695. The government here, however, presented no information on Woodall's expected guideline range.

Turning to any special circumstances, there is no evidence that Woodall is likely to be subject to a civil commitment. Although the Harper hearing found Woodall was not dangerous

while confined in a prison setting, that is a different question than whether he would be dangerous if released. Id. at 694 n.6.

Woodall has been in federal custody since July 30, 2009, a period of three years. One reason for the delay is that in 2010, Woodall was convicted in state court of multiple sexual abuse charges. I will assume that his entire time in custody will be credited against any future federal sentence, but without the expected guideline range, I am unable to calculate the length of the likely sentence after crediting the time. I will not rectify the situation by asking for additional briefing because of my concerns raised by Woodall's state conviction.

On May 7, 2010, the state court sentenced Woodall to a prison term of approximately 30 years, as stated in an earlier motion to continue the trial date in the federal case. Neither counsel at the hearing knew the exact length of the state sentence. The government reported that the state conviction was still on appeal and a ruling was not expected for another year.

The government interest is strengthened by the fact that the victim in the federal charge is not only a victim of a form of sexual abuse, but is a minor and is a different victim than the victims in the state charges. The government wishes to obtain justice for this victim too. I share the government's concern. I am unable, however, to get past the fact that Woodall, who is 53 years old, is likely to remain incarcerated on the state charge for the remainder of his life. Although the conviction and sentence is not yet final, the state would try Woodall again in the unlikely event the appellate court overturns the conviction. There is nothing to suggest he would not be convicted a second time, particularly because there are three separate victims in the state charges.

In view of the fact that it is likely Woodall will ultimately remain incarcerated on the state charges, I find the government has not established by clear and convincing evidence that important governmental interests are at stake in prosecuting Woodall in federal court.

II.     Furtherance of Governmental Interests

In the second Sell factor, the government must establish that involuntary medication will "significantly further" the government's interest in prosecuting the defendant. Ruiz-Gaxiola, 623 F.3d at 695. This requires the government to prove two facts by clear and convincing evidence:

> first, "that administration of the drugs is substantially likely to render the defendant competent to stand trial"; and second, "that administration of the drugs is substantially unlikely to have side effects that will interfere significantly with the defendant's ability to assist counsel in conducting a trial defense, thereby rendering the trial unfair.'"

Ruiz-Gaxiola, 623 F.3d at 695 (quoting Sell, 539 U.S. at 181).

      A.     Restoration to Competency

The staff at FMC Springfield diagnosed Woodall with bipolar I disorder, most recent episode manic with severe psychotic features. Woodall displayed symptoms of rapid speech, poor sleep, flight of ideas, anger at times, agitation at times, psychotic delusional thinking, disorganized thinking, and hyperreligious thinking. Woodall would become very argumentative with his care providers and refused his MS medications at times.

The defense psychologist, Dr. True, examined Woodall and concluded that his psychotic condition most closely resembles a delusional disorder of the grandiose type. Dr. True observed that Woodall's speech was pressured and highly repetitive. He administered a Rorschach test to Woodall and interpreted the results as belonging to a person with significantly impaired capacities to think logically and coherently and to perceive people and events realistically. The

Page 7 - OPINION AND ORDER

condition could be caused be several things, including schizophrenia, delusional disorder, and bipolar disorder. Dr. True did not give any further consideration of a diagnosis of bipolar disorder.

Dr. Sarrazin considered a diagnosis of delusional disorder for Woodall but decided against it because Woodall displayed many symptoms of mania, including rapid speech and flight of ideas. Dr. True did not testify and, thus, did not defend his diagnosis. Based on the record before the court, I conclude the government has proven by clear and convincing evidence that Dr. Sarrazin's diagnosis is correct.

Dr. Sarrazin explained that psychosis is a symptom and can be present in a mood disorder. Woodall was likely rendered incompetent because of the psychotic symptoms, such as his disorganized thinking and delusions, and not because of the mania. If Woodall would cooperate by taking the medication, Dr. Sarrazin would likely treat him with an antipsychotic drug, a mood stabilizer, and something to help him sleep. In a forced medication scheme, however, Dr. Sarrazin would treat Woodall with only an antipsychotic which would treat both the psychosis and the mood. Mood stabilizers alone would not be an appropriate treatment because they do not treat the psychosis. Additionally, mood stabilizers can only be given by mouth so they are not candidates for involuntary medication. According to Dr. Sarrazin, it is extremely common to treat bipolar disorder with antipsychotics without use of a mood stabilizer, even in a community setting. He claims that it is widely accepted that an antipsychotic is an appropriate treatment for Woodall's diagnosis.

Dr. Sarrazin explained that there are first generation antipsychotics, such as haloperidol (Haldol), and second generation antipsychotics, such as aripiprazole (Abilify) and ziprasidone

Page 8 - OPINION AND ORDER

(Geodon). Both types of drugs are equally effective, but they have different side effects which must be monitored. This is discussed more below.

Dr. Sarrazin believes it is substantially likely that Woodall would be rendered competent by antipsychotics in four to six months. On the other hand, Dr. Sarrazin's report explains some of the statistics based on American Psychiatric Association practice guidelines. Patients do not react uniformly to antipsychotics. Under the most optimistic interpretation of the data, Woodall has a 90 percent chance of restoration to competency; under the most pessimistic interpretation, Woodall has a 40 percent chance of restoration to competency.

Because Woodall suffers from MS and its effect on his ability to move normally, Dr. Sarrazin would prefer to use a second generation antipsychotic because of the likelihood of fewer motor side effects. Woodall would be offered an oral version of one of these drugs. If he refused to take it, Dr. Sarrazin would begin treatment by restraining Woodall and injecting him twice a day with Geodon, a second generation drug available in an immediate-acting injectable form. Dr. Sarrazin hopes that after a few days of Geodon, Woodall would be rational enough to agree to take an oral medication. If he did not agree to cooperate within two or three days, Dr. Sarrazin would switch to a long-acting injectable form of the first generation antipsychotic Haldol, which would be given to Woodall every two to four weeks. An alternative would be to switch to a long-acting injectable form of the second generation antipsychotic risperidone, which is given every two weeks. Dr. Sarrazin expects Woodall's agitation from being restrained to lessen as he gets more medication, but it is possible Woodall would remain agitated when restrained during the entire course of treatment.

Dr. Sarrazin's written report also refers to three studies on the competency restoration of psychotic defendants, with the studies reporting success rates of 75 percent or more. Two 1993 studies by Ladds reported on 61 defendants who were involuntarily treated, with 87 percent of them being rendered competent to stand trial. Dr. Sarrazin was not cross examined about any design or analysis flaws in these studies. I do note that one of the studies in his report, a 2007 Herbel and Stelmach study of 22 incompetent defendants with delusional disorder which returned 77 percent to competency using involuntary medication, was strongly criticized by the defense expert in Ruiz-Gaxiola for lacking a randomized control group. The court was persuaded by the cross examination, stating that "[b]y their own terms, the findings of the Herbel study are both limited and tentative." Ruiz-Gaxiola, 623 F.3d at 698.

In summary, the evidence is that Dr. Sarrazin believes it is substantially likely that Woodall can be returned to competency by the proposed treatment plan. The American Psychiatric Association practice guidelines give a 40 to 90 percent chance of restoration to competency. Other studies on which Dr. Sarrazin relies give a better than 75 percent chance of success, although one of those studies has been criticized. Woodall has never taken an antipsychotic, so his prior response to various drugs is not available to inform the question. It is far from a safe bet, but I conclude the government has proven by clear and convincing evidence that administration of the proposed treatment plan is substantially likely to render Woodall competent to stand trial.

B. Side Effects

According to Dr. Sarrazin's report, first generation antipsychotics have more side effects, including neuromuscular side effects which affect motor movement. The acute neuromuscular

Page 10 - OPINION AND ORDER

side effects include: (1) acute dystonic reactions in 2 to 10 percent of patients, causing sustained and painful contractions of various muscle groups in the jaw, back, neck, eyes, and tongue; (2) drug-induced Parkinsonism in 15 to 50 percent of patients, causing rigidity, resting tremor, and decreased spontaneous facial expression; and (3) akathisia in 20 to 30 percent of patients, causing an uncomfortable inner sense of restlessness that may be manifested by rocking, fidgeting, or pacing movements. According to Dr. Sarrazin, these side effects can be managed by administering other drugs and lowering the dosage of the antipsychotic.

First generation antipsychotics can cause delayed onset side effects such as tardive dyskinesia. According to the National Institute of Neurological Disorders and Stroke at the National Institute of Health:

> Tardive dyskinesia is characterized by repetitive, involuntary, purposeless movements. Features of the disorder may include grimacing, tongue protrusion, lip smacking, puckering and pursing, and rapid eye blinking. Rapid movements of the arms, legs, and trunk may also occur. Involuntary movements of the fingers may be present.

http://www.ninds.nih.gov/disorders/tardive/tardive.htm (last visited Aug. 8, 2012).

According to Dr. Sarrazin's report, tardive dyskinesia occurs in 5 percent *yearly* of the general patient population and 25 to 30 percent *yearly* in an elderly patient population.[1] The numbers are much lower for second generation antipsychotics. The report concludes that Woodall is unlikely to experience any of the tardive syndromes if he was treated for an entire year with either a first or second generation antipsychotic. Tardive dyskenisia cannot be reversed

---

[1] Put another way, Haldol has a 20 percent "lifetime prevalence or lifetime risk" of causing tardive dyskinesia. Ruiz-Gaxiola, 623 F.3d at 706 (testimony of defense expert).

in at least 50 percent of patients suffering from it, even if detected early. Ruiz-Gaxiola, 623 F.3d at 705.

Second generation antipsychotics have less motor movement side effects and more metabolic side effects, such as raised blood sugar, raised lipids, and weight gain. These would be monitored, and if Woodall refused to cooperate with the monitoring program after being educated on the benefits to him, the protocol would be enforced involuntarily approximately every 90 days.

According to Dr. Sarrazin, there is some likelihood that antipsychotics would interfere with Woodall's ability to assist trial. The drugs can cause dry mouth, sedation, and dizziness. Dr. Sarrazin would lessen the side effects, including any motor side effects, by adjusting the medication dosage or managing the side effect with another medication. He did not consider this a difficult problem.

Viewing this evidence, it is unlikely that Woodall would suffer from tardive dyskinesia during the time required to restore competency and prepare for trial of the case. The other motor side effects, although certainly distressing to suffer through, likely could be controlled through medication adjustments. The possible metabolic side effects, if Woodall can be treated with a second generation drug, are detrimental in the long run to Woodall's health but should not interfere in the short run with trial preparation. The possible side effects of dry mouth, sedation, and dizziness could interfere to some extent with trial preparation but also can likely be controlled with medication adjustments. There is no evidence to the contrary for any of these points. Taken together, there could be some delays in trial preparation while medications are

adjusted, but I am persuaded by Dr. Sarrazin's testimony that the possible short-term side effects could be put to rest.

Thus, I conclude the government has proven by clear and convincing evidence that administration of the proposed treatment plan is substantially unlikely to have side effects that will interfere significantly with Woodall's ability to assist counsel in conducting a trial defense, thereby rendering the trial unfair.

In summary, the government has proven both prongs of the second Sell factor by clear and convincing evidence.

III.   Necessity of Involuntary Medication

In the third Sell factor, the government must prove by clear and convincing evidence "that involuntary medication is necessary to further" the government's interests in prosecution and "'that any alternative, less intrusive treatments are unlikely to achieve substantially the same results.'" Ruiz-Gaxiola, 623 F.3d at 701 (quoting Sell, 539 U.S. at 181). The inquiry also requires the court to "'consider less intrusive means for administering the drugs.'" Id. at 703 (quoting Sell, 539 U.S. at 181).

The proposed treatment plan includes offering Woodall the oral version of the drugs prior to restraining him to administer an injectable version. Thus, a possibility exists that after receiving some injected doses of an antipsychotic, Woodall would agree to comply by taking the pills. Without an improvement in his mental state, it is doubtful that Woodall would ever agree to take the medication. Woodall emphasized to Dr. True that he promised Jesus he would not take any more drugs. Thus, Woodall's psychosis is working directly against the proposed treatment.

Page 13 - OPINION AND ORDER

According to Dr. Sarrazin, using a mood stabilizer without an antipsychotic drug would not be beneficial because it would not impact Woodall's psychosis. Group therapy will not work with Woodall because he becomes agitated. Woodall would not benefit from individual therapy because he does not think he is mentally ill. Moreover, there is no evidence that waiting for the manic episode to end without treatment would be successful because manic episodes can last for years.

The reports are replete with Woodall's statements to the clinicians that he is not mentally ill. He repeated numerous times at the court hearing that he is not bipolar. There is no evidence he would benefit in any way from group or individual therapy when he is firmly convinced he is not ill.

Accordingly, the government has proven by clear and convincing evidence that involuntary medication is necessary to further the government's interests in prosecution and that any less intrusive treatments are unlikely to achieve substantially the same results.

IV.  Medical Appropriateness of Involuntary Medication

In the fourth Sell factor, the government must establish that administration of the drugs is medically appropriate. Thus, the government must "prove by clear and convincing evidence that the proposed regime of involuntary medication is 'in the *patient's* best medical interest in light of his medical condition." Ruiz-Gaxiola, 623 F.3d at 703 (quoting Sell, 539 U.S. at 181). Under this factor, the court must consider

> *all* of the medical consequences of the proposed involuntary medication, including those consequences that may not affect the defendant's trial in any way, but result in long term side effects. It also requires the court, in making the decision, to consider the length of time the treatment regime must be continued in order to provide the desired medical benefit to the patient.

Id. at 704-05 (footnote omitted).

In the discussion below, I am going to assume the worst case scenario, namely, that Woodall will end up being treated with Haldol, a first generation antipsychotic. That is the likely scenario in the written proposed treatment plan if Woodall will not comply with oral medication. Although Dr. Sarrazin testified about the possibility of an injectable form of a second generation antipsychotic, risperidone, it is not as long-acting and would require restraining Woodall more often to administer it. So, I am going to assume that Woodall will be treated with Haldol.

Dr. Sarrazin believes it is medically appropriate to treat Woodall with an antipsychotic drug, even though Woodall has MS, because the treatment might make Woodall more compliant with his MS treatment. I do not doubt this but I am concerned about the effect of an antipsychotic on Woodall's MS symptoms. He appeared in court in a wheelchair, a device he did not need a year ago. His attorney reports Woodall has increasing difficulty with balance and fatigue. I do not have a medical report on his MS but I assume it is progressing. I am very concerned that the acute neuromuscular side effects that can arise from Haldol–including painful contractions of various muscle groups, drug-induced Parkinsonism causing rigidity and resting tremor, and akathisia manifested by rocking and fidgeting–would be more of a problem in a patient who also has MS and the resulting difficulties with balance and fatigue. There is no evidence or report discussing this issue.

Additionally, there is no evidence that the medication will have any effect after it is no longer administered involuntarily to Woodall. There is also no evidence that Woodall is bothered by his mental illness in any way. He continually refers to his close relationship with Jesus. The clinician at FDC SeaTac stated: "Mr. Woodall's mood was generally euphoric and

elated, particularly when discussing religious matters. He often laughed and chuckled gleefully. He expressed excitement, enthusiasm, and intensity in sharing his various spiritual stories. He reported feeling joyful because of his relationship with Jesus." Ex. 1, at 12. The Harper hearing concluded that Woodall was not a danger to himself or others in a prison setting, where he is likely to remain to serve the lengthy state sentence.

To maintain competency Woodall would have to remain on the antipsychotic throughout trial preparation and trial. If it takes four to six months to restore Woodall to competency, trial preparation and trial would take another four to six months, even if put on a fast track. There is no evidence Woodall would have any positive effect from the antipsychotic if the involuntary administration of it ends after trial concludes. The length of treatment requires the court to address the risk of tardive dyskinesia versus the utility of the antipsychotic to Woodall once trial ends. The Ruiz-Gaxiola court discussed this at length:

> From a patient's standpoint, the medical benefit of becoming competent to stand trial for only a few months (even if that outcome were likely) and then returning to his prior state of Delusional Disorder could not outweigh even a minuscule risk of a disfiguring and potentially irreversible side effect. Because the proposed course of medication could be considered medically appropriate treatment only for those patients who expect or hope to continue undergoing it indefinitely (and clearly any patient who must be forced to take the antipsychotic medication involuntarily is not in that category), "the patient's best medical interest" cannot be measured, as the district court and the government did, by evaluating the benefit and risk over the period of the trial only. There is no medical value to a medication regime that alleviates the mental disorder, if it does so at all, only for the short period of time necessary for trial preparation and the trial itself, while creating a risk of side-effects that would render the regime inappropriate for a patient's long-term treatment. If the involuntary antipsychotic medication is to be administered for so short a period, it is clearly not in "the patient's best medical interest" to risk serious medical consequences for a benefit that, if one results at all, is only a temporary alleviation of the symptoms and not a long-term remedy for the mental illness.

> Because a medical justification for an involuntary regime of Haldol treatment would be conceivable only if the antipsychotic medication were to be taken on a long-term basis, the issue would become whether the likelihood and value of the long-term benefits outweigh the likelihood and severity of the long-term harms. With regard to the latter, government expert Cheltenham testified that the medication carries a twenty percent "lifetime prevalence or lifetime risk" of tardive dyskinesia. Even disregarding the testimony of the more-experienced defense psychiatrist that the administration of Haldol would be counter-productive in any event, the government did not prove by clear and convincing evidence that a Haldol regime would be in the patient's best medical interest in light of his medical condition, because it introduced no evidence that the purported lifetime benefits to Ruiz would make the proposed treatment medically appropriate in spite of the significant lifetime risk.

Ruiz-Gaxiola, 623 F.3d at 706.

Woodall has a different diagnosis than Ruiz-Gaxiola, and thus has a greater likelihood to be returned to competency by Haldol. But that does not address the fact that Woodall is at risk, and much greater than a minuscule risk, of getting tardive dyskinesia even though there is no evidence of any long-term benefit from taking the medication. I see no difference between this analysis and Woodall's situation. He is at risk of getting tardive dyskinesia. That risk is balanced against the lack of any evidence of long-term benefit if Woodall stops taking the Haldol. And I see nothing on which to base a conclusion that Woodall will continue taking the antipsychotic after trial concludes.

For these reasons, I find the government has failed to prove by clear and convincing evidence that the proposed treatment plan is in Woodall's best medical interest in light of his medical condition.

///

///

## CONCLUSION

The government failed to prove by clear and convincing evidence the first and fourth factors of the <u>Sell</u> test. This case does not present the "rare circumstances" in which the government is allowed to forcibly medicate a defendant for the purpose of restoring his competency to stand trial. <u>Ruiz-Gaxiola</u>, 623 F.3d at 687. Thus, I decline to grant the government's request. In the event that I came to that conclusion, the warden at FMC Springfield noted that his clinical staff would recommend referring Woodall for an evaluation pursuant to 18 U.S.C. § 4246 to determine if he is dangerous to others or the property of others. I will schedule a status conference in the near future to discuss this request.

IT IS SO ORDERED.

Dated this   20th   day of August, 2012.

     /s/ Garr M. King
Garr M. King
United States District Judge